[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 12-15680

_____

D.C. Docket No. 2:10-cv-00014-LGW-JEG

DEFENDERS OF WILDLIFE, et al.,

Plaintiffs/Appellants,

versus

UNITED STATES DEPARTMENT OF THE NAVY, et al.,

Defendants/Appellees.

_____

Appeal from the United States District Court
for the Southern District of Georgia

_____

(October 1, 2013)

Before TJOFLAT and WILSON, Circuit Judges, and COOGLER,[*] District Judge.

COOGLER, District Judge:

## I.     INTRODUCTION

_____

[*] Honorable L. Scott Coogler, United States District Judge for the Northern District of Alabama, sitting by designation.

Appellants, Defenders of Wildlife, the Humane Society of the United States, Whale and Dolphin Conservation Society, Natural Resources Defense Council, Center for a Sustainable Coast, Florida Wildlife Federation, South Carolina Coastal Conservation League, North Carolina Wildlife Federation, Animal Welfare Institute, Ocean Mammal Institute, Citizens Opposing Active Sonar Threats, and Cetacean Society International (hereinafter, "Appellants"), appeal the district court's grant of summary judgment in favor of Appellees, the United States Department of the Navy, Secretary of the Navy, National Oceanic and Atmospheric Administration, National Marine Fisheries Service, and Secretary, United States Department of Commerce.  In this appeal, Appellants challenge the United States Department of the Navy's ("the Navy's") decision to install and operate an instrumented Undersea Warfare Training Range ("USWTR" or "the range") fifty nautical miles offshore of the Florida/Georgia border in waters adjacent to the only known calving grounds of the endangered North Atlantic right whale, and the National Marine Fisheries Service's ("NMFS's") biological opinion assessing the impacts of the USWTR on threatened and endangered species.  This action is predicated on alleged violations of the National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq*. ("NEPA"), the Endangered Species Act, 16 U.S.C. §§ 1531 *et seq*. ("ESA"), and the Administrative Procedure Act, 5 U.S.C. §§ 701-

2

706 ("APA"), in analyzing and approving the USWTR. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we AFFIRM.

## II.    BACKGROUND

### A. The Navy's Need for the USWTR

The Navy has used instrumented undersea ranges to train its personnel since the 1960s. These ranges allow shore-based operators to evaluate the performance of the participants and to provide feedback in both real time and later replays of the exercises. In 1996, the Navy published a Notice of Intent to build such a range somewhere in the Atlantic to more effectively train its personnel in shallow-water anti-submarine warfare. Training in shallow water is important because the Navy's Atlantic fleet is deployed to many shallow-water environments worldwide, and this range would be the first designed especially for shallow-water training.

### B. The National Environmental Policy Act

The Navy then began the process of complying with its statutory mandates, including the two environmental statutes relevant here, NEPA and the ESA. NEPA was designed to infuse environmental considerations into government decision-making. *See* 40 C.F.R. § 1501.1 (explaining NEPA's purpose). *See also Wilderness Watch & Pub. Emps. for Envtl. Responsibility v. Mainella*, 375 F.3d 1085, 1094 (11th Cir. 2004) ("NEPA essentially forces federal agencies to document the potential environmental impacts of significant decisions before they

3

are made, thereby ensuring that environmental issues are considered by the agency and that important information is made available to the larger audience that may help to make the decision or will be affected by it.") (citing *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349, 109 S. Ct. 1835, 1845, 104 L.Ed.2d 351 (1989)).  "NEPA imposes procedural requirements rather than substantive results, and so long as an agency has taken a 'hard look' at the environmental consequences, a reviewing court may not impose its preferred outcome on the agency."  *Wilderness Watch*, 375 F.3d at 1094 (citing *Fund for Animals, Inc. v. Rice*, 85 F.3d 535, 546 (11th Cir. 1996)).

To ensure a well-considered decision, NEPA requires that when a federal agency proposes a "major Federal action[] significantly affecting the quality of the human environment," it must prepare and file an environmental impact statement ("EIS") that examines the environmental impact or impacts of the proposed action, compares the action to other alternatives, and discusses means to mitigate any adverse environmental impacts.  42 U.S.C. § 4332(C).  Preparing an EIS requires several steps, the first of which is determining whether one is needed.  If the agency finds, based on a less formal "environmental assessment," that the proposed action will not significantly affect the environment, the agency is permitted to issue a "Finding of No Significant Impact" in lieu of an EIS.  40 C.F.R. §§ 1501.4, 1508.9, 1508.13.  However, when an EIS is required, the federal

4

agency first prepares a draft EIS and solicits public comments. *Id.* § 1503.1. The agency must then "assess and consider" the comments in drafting the final EIS and publish a notice of availability of the final EIS in the Federal Register. *Id*. §§ 1503.4, 1506.10(b). When the agency makes its final decision regarding the proposed action and alternatives discussed in the final EIS, the agency prepares "a concise public record of decision" identifying the agency's action and the alternatives it considered. *Id.* § 1505.2. The record of decision ("ROD") states what the decision was, identifies all alternatives considered by the agency, and states whether all practicable means to avoid or minimize environmental harm from the alternative selected have been adopted, and if not, why not. *Id.* After issuing the ROD, the agency is then authorized to implement its decision. *Id.* § 1506.1.

### C. The Navy's NEPA Compliance

The Navy originally considered four alternative sites for the range: the Gulf of Maine, near Wallops Island, Virginia, off the coast of North Carolina, and offshore of Charleston, South Carolina. Pursuant to NEPA, the Navy released a draft EIS in 2005 proposing to build the USWTR off the coast of North Carolina but then issued a revised draft EIS three years later, changing the proposed range site to fifty nautical miles offshore of Jacksonville, Florida, in a Navy training area known as the Jacksonville Operating Area. Several factors prompted the Navy's

decision to relocate the proposed site for the range.  The Navy had closed the Naval Air Station in Brunswick, Maine and had relocated several maritime aircraft squadrons to Naval Air Station Jacksonville in 2005, with the result that five fleet squadrons, one fleet replacement squadron, and all of the East Coast anti-submarine warfare helicopters were then based at either Naval Air Station Jacksonville or Naval Station Mayport.  Further, Florida has been a fleet concentration area since before World War II and has one of the largest Atlantic fleet assemblages of ships, aircraft and personnel.

The Navy concluded that co-locating the range facility in the same area as the primary user represented the greatest efficiency in applying limited resources to support training.  The Navy also concluded that locating the proposed range in the Jacksonville Operating Area would provide the required shallow-water environment and would be available for training given the climate.  Finally, the Navy has conducted anti-submarine warfare training in the Jacksonville Operating Area for more than sixty years with its training there already the subject of previous comprehensive environmental review and analyses pursuant to NEPA and the ESA.

After soliciting and receiving public comment on the revised draft EIS, the Navy issued its final EIS in 2009 for the installation and operation of the range at the Jacksonville Operating Area.  The range will consist of undersea, fiber optic

6

telecommunications cables and up to 300 nodes over a 500-square-nautical-mile area of ocean. The nodes will transmit and receive acoustic signals from ships and submarines operating within the range, thus allowing the position of exercise participants to be determined and stored electronically for real-time feedback and future evaluation. The latest projections are that construction will begin in fiscal year 2014, with the range partially functional in 2018 and fully operational in 2023.

The Navy's final EIS fully analyzed the environmental impacts of both constructing and operating the range. In analyzing the impacts of constructing the range, the Navy took a hard look at that portion of the critical habitat for the North Atlantic right whale, an endangered species, which is located off the coast of Florida, 35 nautical miles inshore of the proposed range. Only 300 to 400 North Atlantic right whales remain, and each fall, females return to the waters off Georgia and Florida to give birth to their calves before migrating north to their feeding grounds in the spring. Because the area offshore Georgia and Florida is the species' only known calving ground, regulations have been adopted in adjacent waters to protect right whales from threats of fishing gear entanglement and ship collisions. The Navy's EIS noted that the only construction that will take place in the right whale's critical habitat is installation of the trunk cable connecting the range with the onshore cable termination facility at Mayport. Cable installation

will be suspended during the right whale calving season, and the trunk cable will be buried. The Navy thus concluded that any impacts of constructing the range will be minimal, and none of the Navy's analyses of that part of the range project is challenged in this appeal.

The EIS also fully analyzed the expected impacts of operating the range for anti-submarine warfare training when deciding when and where to build it. A wide range of ships, submarines, and aircraft that already conduct anti-submarine warfare training in the Jacksonville Operating Area will be the users of the range. The most frequent expected users of the range will be Navy helicopters and aircraft based in Mayport and Jacksonville, not submarines or surface vessels. The Navy analyzed the expected environmental impacts of the 470 exercises expected to occur annually on the range, including the impacts to endangered and threatened species such as right whales and various species of sea turtles.

The Navy examined the risks of operating the range at each of the four alternative sites studied,[1] including the impacts from ship strikes, entanglements, and the use of sonar. The Navy's analysis of the impacts from operations was informed by its previous analyses of the impacts of its ongoing anti-submarine warfare training in the Jacksonville Operating Area. For example, with respect to

---

[1] Specifically, the Navy compared the Jacksonville Operating Area location with sites off the coast of South Carolina, off the coast of North Carolina, and off the coast of Virginia. The Maine location that was originally proposed was abandoned after the Navy closed its air station there.

ship strikes, the Navy determined that because the range will be used by vessels and aircraft that already conduct anti-submarine warfare training in the Jacksonville Operating Area, the range is not expected to increase ship traffic in the area, including traffic across right whale habitat.  Appellants do not challenge these substantive conclusions in the Navy's EIS in this appeal.

### D. The Endangered Species Act

In addition to submitting its EIS pursuant to NEPA, the Navy also was required to comply with the ESA in planning for the USWTR.  The policy of Congress in enacting the ESA was to ensure "that all Federal departments and agencies . . . seek to conserve endangered species and threatened species . . ." 16 U.S.C. § 1531(c)(1).  *See also Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 184, 98 S. Ct. 2279, 2297, 57 L.Ed.2d 117 (1978) ("The plain intent of Congress in enacting this statute was to halt and reverse the trend toward species extinction, whatever the cost.").  In accordance with this policy, the ESA provides for the listing of species as threatened or endangered and the designation of their critical habitat.  16 U.S.C. § 1533.  The Secretary of Commerce has responsibility for listed marine species (including marine mammals and sea turtles when in the marine environment) and administers the ESA through the NMFS, while the Secretary of the Interior is responsible for listed terrestrial species, inland fish species, and

9

manatees, and administers the ESA through the U.S. Fish and Wildlife Service ("FWS"). *Id.* §§ 1532(15), 1533(c); 50 C.F.R. §§ 17.11, 402.01(b).

The ESA protects listed species in several ways. Section 9 establishes a prohibition on the "taking" of any member of a listed endangered or threatened species. 16 U.S.C. § 1538(a)(1)(B). The ESA defines the term "take" broadly, as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." *Id*. § 1532(19). Section 7 of the ESA directs federal agencies to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species" or destroy critical habitat. *Id*. § 1536(a)(2). To comply with this provision, the ESA requires that a federal agency consult with the appropriate expert agency, either the NMFS or the FWS, under certain circumstances. In determining whether formal consultation with the FWS or NMFS is necessary, the federal agency first prepares a biological assessment to evaluate the potential effects of its proposed action "on listed and proposed species and designated and proposed critical habitat and determine whether any such species or habitat are likely to be adversely affected by the action . . . ." 50 C.F.R. § 402.12(a). If the biological assessment determines that an action "may affect" a listed species or critical habitat, formal consultation is required. *Id.* § 402.14(a). Formal consultation is not required when the biological assessment determines that

10

the proposed action is not likely to adversely affect any listed species or critical habitat. *Id.* § 402.14(b)(1).

If formal consultation is necessary, the NMFS or the FWS is then responsible for formulating a "biological opinion as to whether the action, taken together with cumulative effects, is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat." *Id.* § 402.14(g)(4). The biological opinion must include a "detailed discussion of the effects of the action on listed species or critical habitat" in addition to the expert agency's ultimate opinion on jeopardy. *Id.* § 402.14(h)(2). In preparing the biological opinion, the NMFS or the FWS is to use "the best scientific and commercial data available." 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(g)(8). If the NMFS or the FWS concludes the action is likely to jeopardize the continued existence of listed species, it must suggest "reasonable and prudent alternatives" which can be taken by the federal agency to ensure that its action does not jeopardize the continued existence of the species. 16 U.S.C. § 1536(b)(3)(A).

In 1982, the ESA was amended "to resolve the situation in which a federal agency . . . has been advised that the proposed action will not violate Section 7(a)(2) of the Act [i.e., the prohibition on jeopardizing the continued existence of listed species] but . . . will result in the taking of some species incidental to that

11

action." H.R. Rep. No. 97-567 at 26 (1982), *reprinted in* 1982 U.S.C.C.A.N. 2807, 2826. In that situation, the NMFS's or the FWS's biological opinion must include an incidental take statement specifying the amount or extent of anticipated take. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i). The incidental take statement must discuss reasonable and prudent measures necessary or appropriate to minimize the impact of the incidental take. 16 U.S.C. § 1536(b)(4). The incidental take statement thus provides an exception to the ESA's take prohibition; as any take in compliance with the terms and conditions of an incidental take statement is lawful. *Id*. § 1536(o)(2). If the NMFS or the FWS decides that no take is likely from the implementation of a proposed federal action, no incidental take statement is required in the biological opinion. *Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife*, 273 F.3d 1229, 1240 (9th Cir. 2001) ("Absent an actual or prospective taking under Section 9, there is no 'situation' that requires a Section 7 safe harbor provision.").

Where a proposed action is likely to result in take of listed marine mammals, such as right whales in this case, the NMFS is prohibited from issuing an incidental take statement until the incidental take has first been authorized under the Marine Mammal Protection Act ("MMPA"). 16 U.S.C. § 1536(b)(4)(C) ("If after consultation under subsection (a)(2) of this section, the Secretary concludes that if an endangered species or threatened species of a marine mammal is involved, the

taking is authorized pursuant to section 1371(a)(5) of this title; the Secretary shall provide the Federal agency and the applicant concerned, if any, with a written [incidental take statement] . . . .").  In relevant part, the MMPA generally prohibits the take of listed marine mammals but provides for several exceptions to the general take prohibition, including "incidental, but not intentional" take of "small numbers" of marine mammals by persons "engage[d] in a specified activity" during periods of "not more than five consecutive years."  *Id.* § 1371(a)(5)(A).  Any incidental take statement for listed marine mammals must also include the mitigation measures prescribed by the MMPA take authorization.  *Id.* § 1536(b)(4)(C)(iii).

### E.  The Navy's and the NMFS's ESA Compliance

To comply with Section 7(a)(2) of the ESA, the Navy prepared a biological assessment and initiated formal consultation with the NMFS about the impacts to endangered species of installing and operating the USWTR.  The NMFS then issued a biological opinion on July 28, 2009, concluding that installation of the USWTR is not likely to adversely affect listed species, and that while expected operations on the USWTR are likely to adversely affect listed species, including some species of sea turtles and ESA-listed marine mammals such as right whales, expected operations are not likely to jeopardize their continued existence or

13

destroy or adversely modify their critical habitat.  *See* AR001731-001967.[2]

Because USWTR operations are likely to adversely affect listed species and some take is expected to occur during operations, the Navy must obtain an incidental take statement from the NMFS prior to commencing operations on the USWTR in order to avoid potential take liability under Section 9 of the ESA.  *See* 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i).  However, the NMFS explained in the biological opinion that the document does not include an incidental take statement for the operations phase of the USWTR at this point because the ESA requires that the take of listed marine mammals must first be authorized under the MMPA before an incidental take statement may be issued, and any such MMPA take authorization issued in 2009, which is only effective for five year periods, would expire before operations ever commenced.  *See* AR001731.  *See also* 16 U.S.C. § 1536(b)(4)(C).  Because the NMFS's proposed issuance of any MMPA take authorization would thus trigger a new consultation under ESA Section 7(a)(2), the biological opinion states, "If and when such regulations or authorizations are issued, the [NMFS] will prepare a new biological opinion to include an incidental take statement for the endangered and threatened species that have been considered in [the biological opinion] as appropriate."  AR001930.

---

[2] "AR_____" refers to the NMFS's Administrative Record for its Biological Opinion.

14

Based on the Navy's final EIS and the NMFS's biological opinion, the Navy announced its decision to construct the USWTR at the Jacksonville site in a July 31, 2009 ROD, stating that construction is expected to take at least five years to complete and thus operations are not anticipated to occur until at least 2014. *See* DON185885.[3] The ROD made a final decision only regarding "a portion of the proposed action, a decision to move forward with installation of the USWTR." *Id*. Because no take is expected to occur during range construction, and due to the "anticipated four-to five-year period between now and completion of installation and the five-year limit on the period of NMFS' MMPA rulemaking," the ROD explains that "a MMPA rule related to training would likely expire before training could commence." *Id*. The ROD continues: "Therefore Navy and NMFS[] have determined that their resources would be better utilized by the Navy delaying its application for appropriate take authorizations under the MMPA and ESA until the Navy has identified with greater specificity the time period for commencement of training on the USWTR." *Id*. As a result, the Navy authorized construction of the range in the ROD, but it deferred authorization of operations on the range until closer in time to those operations occurring and until the requisite MMPA take authorization has been obtained, which could potentially impose conditions on activities.

---

[3] "DON_____" refers to the Navy's Administrative Record for its Record of Decision.

15

## III.  PROCEDURAL HISTORY

Appellants filed this case on January 28, 2010, in the United States District Court for the Southern District of Georgia, challenging the Navy's EIS and ROD and the NMFS's biological opinion as arbitrary and capricious under the APA because, they claimed, the agencies had failed to comply with various requirements of NEPA and the ESA.  The parties filed cross motions for summary judgment on all claims.  The district court held a hearing on the motions on March 15, 2012. On September 6, 2012, the district court denied Appellants' motion for summary judgment and granted summary judgment to all defendants, concluding that the Navy and the NMFS complied fully with NEPA, the ESA, and the APA.  Shortly after the district court's ruling, the Navy signed a contract to begin construction of the USWTR.  Appellants now appeal the district court's grant of summary judgment, narrowing their arguments on appeal to the following three claims: 1) the Navy violated NEPA and its implementing regulations by signing a contract for construction of the USWTR prior to signing an ROD to operate the USWTR; 2) the NMFS violated the ESA and the APA by issuing a biological opinion that failed to "meaningfully" analyze impacts from operations on the USWTR; and 3) the NMFS violated the ESA and the APA by failing to include in its biological opinion a required incidental take statement predicting, assessing the impact of, and taking measures to minimize the impact of incidental take of threatened and

16

endangered species that is expected to occur in connection with operation of the USWTR.

## IV.    STANDARD OF REVIEW

We review the district court's grant of summary judgment *de novo* and use the same standard of review utilized by the district court. *Miccosukee Tribe of Indians of Florida v. United States*, 566 F.3d 1257, 1264 (11th Cir. 2009). The Navy's ROD and the NMFS's biological opinion are final agency actions subject to judicial review under the APA, 5 U.S.C. §§ 701-706. *See id*. Specifically, the standard under the APA is whether the agency's action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The arbitrary and capricious standard is "exceedingly deferential." *Fund for Animals, Inc.*, 85 F.3d at 541. "We are not authorized to substitute our judgment for the agency's as long as its conclusions are rational." *Miccosukee Tribe of Indians*, 566 F.3d at 1264 (citing *Sierra Club v. Van Antwerp*, 526 F.3d 1353, 1360 (11th Cir. 2008)). "The court's role is to ensure that the agency came to a rational conclusion, 'not to conduct its own investigation and substitute its own judgment for the administrative agency's decision.'" *Van Antwerp*, 526 F.3d at 1360 (quoting *Pres. Endangered Areas of Cobb's History, Inc. ("PEACH") v. U.S. Army Corps of Eng'rs*, 87 F.3d 1242, 1246 (11th Cir. 1996)). However, an agency action may be found arbitrary and capricious:

17

> where the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Miccosukee Tribe of Indians*, 566 F.3d at 1264 (quoting *Alabama–Tombigbee Rivers Coal. v. Kempthorne*, 477 F.3d 1250, 1254 (11th Cir. 2007)).

## V.    DISCUSSION

### A.  Appellants' NEPA Claim

Appellants confine their NEPA claim on appeal to the argument that the Navy violated 40 C.F.R. § 1506.1(a) by signing a contract for construction of the USWTR before it has issued an ROD for operations on the USWTR.  Appellants make this argument even though the Navy had issued an ROD for its construction of the USWTR.  Section 1506.1(a) forbids an agency from taking certain actions before the issuance of its ROD, as follows:

> (a)     Until an agency issues a record of decision as provided in § 1505.2 (except as provided in paragraph (c) of this section), no action concerning the proposal shall be taken which would:
>
> (1)     Have an adverse environmental impact; or
>
> (2)     Limit the choice of reasonable alternatives.

40 C.F.R. § 1506.1(a).

18

Under the plain language of Section 1506.1(a), Appellants' argument fails. The action taken by the Navy that Appellants challenge as violative of Section 1506.1(a)—signing a contract for construction of the USWTR— did not occur before the Navy signed an ROD concerning that construction, but after, and Section 1506.1(a) only precludes agency action taken before the agency signs an ROD. Although Appellants challenged the Navy's EIS before the district court,[4] they no longer dispute that the EIS fully analyzed the environmental impacts of both installation and future operations on the USWTR, including ruling out alternative sites for the range. Having issued an ROD deciding to construct the USWTR, the decision to proceed with the very construction authorized by the ROD could not have violated Section 1506.1(a), which only prohibits actions taken before signing an ROD.

Yet, Appellants take issue with the fact that the ROD only authorized half of the entire proposal for the range. Indeed, the ROD states that "[a]t this time the Navy is implementing only a portion of the proposed action, a decision to move forward with installation of the USWTR." DON185885. The ROD further states

---

[4] Before the district court, Appellants claimed that the Navy's EIS failed to take a hard look at the environmental impacts of constructing and operating the USWTR and that the analysis was impermissibly segmented in violation of 40 C.F.R. § 1508.25(a)(1) because it only considered the installation phase of the USWTR and not the operations phase. Section 1508.25(a)(1) addresses the scope of an EIS and requires connected actions, which are defined as those that are "closely related," to be discussed in the same EIS. 40 C.F.R. § 1508.25(a)(1). The district court held that the Navy's EIS was not impermissibly segmented, and Appellants do not renew their segmentation argument on appeal.

19

that any "decision to implement training" at the USWTR "will be based on the updated analysis of environmental effects in a future [EIS] in conjunction with appropriate coordination and consultation with the [NMFS] and after compliance with applicable laws and executive orders including the [MMPA], the [ESA], the [NEPA] and the Coastal Zone Management Act (CZMA) as they relate to the operation of the proposed USWTR." *Id.* The Navy has stated that it will prepare a second ROD that specifically authorizes operations based on updated environmental data, prior to operations ever commencing on the USWTR.

In Appellants' view, the Navy prejudiced its future decision to approve operations on the USWTR by proceeding with the $127 million construction of the USWTR prior to an ROD approving operations. Once construction starts, Appellants argue, the Navy's future NEPA process will become nothing more than an attempt to "rationalize or justify decisions already made." *Andrus v. Sierra Club*, 442 U.S. 347, 351 n.3, 99 S. Ct. 2335, 2338 n.3, 60 L.Ed.2d 943 (1979). But Appellants have presented no authority mandating that an agency must authorize all stages of a project in one ROD. Indeed, the EIS is "[a]t the heart of NEPA," *Dept. of Transp. v. Pub. Cit.*, 541 U.S. 752, 757, 124 S. Ct. 2204, 2209, 159 L.Ed.2d 60 (2004), rather than the ROD, which is merely a means of documenting the agency's final decision on a proposed action that required an EIS. While a fundamental NEPA principle is that connected actions be analyzed together in one

20

EIS, *see* 40 C.F.R. § 1508.25(a), Appellants have conceded that the Navy's EIS analyzed both phases of the USWTR, and nothing in NEPA reiterates this "anti-segmentation" principle with regard to an ROD.[5]

Nor are the cases cited by Appellants persuasive, as each case involved an agency's commitment of resources to a project prior to any environmental analysis being conducted. *Andrus*, cited by Appellants, merely explains NEPA's policy that federal agencies must "commence preparation of an environmental impact statement as close as possible to the time the agency is developing or is presented with a proposal" so that the EIS will "serve practically as an important contribution to the decisionmaking process . . . ." 442 U.S. at 351-52 n.3, 99 S. Ct. at 2338 n.3. Similarly in *Metcalf v. Daley*, the Ninth Circuit Court of Appeals held that because a federal agency had committed to support an Indian tribe's whaling plan long before even beginning to prepare the NEPA documents to support that decision, including the environmental assessment and EIS, the agency violated 40 C.F.R. §

---

[5] Appellants point out that NEPA refers to the ROD in the singular form. *See* 40 C.F.R. §§ 1506.1 (referencing "a record of decision"), 1505.2 ("each agency shall prepare a concise public record of decision" that must "[s]tate what the decision was"). We decline to interpret these discrete references as foreclosing an agency from signing an ROD authorizing only part of an action. There is no doubt that an ROD is required to finalize an EIS under NEPA. *See id.* § 1502.2(f). The ROD did that here, and the Navy has stated that a second ROD will be generated, one that finalizes an updated environmental study pertaining to operations, closer in time to operations commencing. The Navy analyzed both phases of the USWTR in its EIS, and that was all that was required of it under NEPA. *See id.* § 1508.25(a). *See also Strycker's Bay Neighborhood Council, Inc. v. Karlen*, 444 U.S. 223, 227-28, 100 S. Ct. 497, 499-500, 62 L.Ed.2d 433 (1980) (per curiam) (noting that the agency considered the environmental effects of its decision and that "NEPA requires no more").

1501.2, which requires a federal agency to integrate the NEPA planning process with other planning at the earliest possible time. 214 F.3d 1135, 1142-45 (9th Cir. 2000). The court stated that at the point that the agency signed the contract with the tribe it made an "irreversible and irretrievable commitment of resources," such that any environmental assessment prepared by the agency subsequently under those circumstances would be "subject to at least a subtle pro-whaling bias." *Id.* at 1143-44. *See also Save the Yaak Comm. v. Block*, 840 F.2d 714, 718-19 (9th Cir. 1988) (finding that the agency violated 40 C.F.R. § 1501.2's timeliness requirement because construction contracts were awarded prior to the agency's preparation of an environmental assessment); *Nat'l Audubon Soc'y v. Dep't of the Navy*, 422 F.3d 174, 206 (4th Cir. 2005) (allowing the Navy to conduct certain preliminary activities while it completed its EIS because none of the activities "include cutting even a single blade of grass in preparation for construction" of the project). The difference is clear here: the Navy did not sign the contract for construction of the USWTR until after it issued its EIS and ROD and after those documents had been upheld by the district court.

Although not in their briefs, counsel for Appellants named at oral argument *Sensible Traffic Alternatives & Resources, Ltd. v. Federal Transit Administration of U.S. Department of Transportation*, 307 F. Supp. 2d 1149 (D. Haw. 2004), as the only known case directly addressing the legal question of whether, when an

22

EIS is issued and approved for an entire multiphase project and that EIS admittedly examines all of the necessary environmental concerns, an agency can issue an ROD that accepts only the first phase of the project, leaving acceptance of the remainder of the EIS for a later time. *Id.* at 1166. The district court in that case answered the question in the affirmative, stating that "[g]iven the purposes of NEPA, there is no categorical bar to the procedure followed here and it was reasonable for the agency to employ it." *Id*. However, the district court then stated that it must examine whether the construction of the project limits the choice of reasonable alternatives as to the remainder of the project for which no ROD had yet issued. *Id.* (citing 40 C.F.R. § 1506.1). In this case, that question has already been answered. The Navy has already fully analyzed reasonable alternative sites for the range in its EIS, an analysis upheld by the district court and no longer challenged on appeal. Mere construction on the already decided-upon site cannot somehow compromise a future analysis of unidentified additional reasonable alternative locations for the range. Having decided, in its EIS and subsequent ROD, where to locate the range after considering the impacts of both installation and operation in the EIS, the Navy has no obligation to revisit or reanalyze its decision in its EIS as to the range's location. Further, nothing in the record indicates that the Navy will not consider and implement other kinds of alternatives to minimize negative environmental impacts from operations on the range, should

23

operations be found in the already-planned future consultation to pose a threat to listed species. *See* Brief of Appellees at 50 ("[I]f jeopardy is determined to be likely [during the future consultation on operations], having installed the Range will not limit the reasonable and prudent measures available for structuring operations to avoid jeopardy, including abandonment of the Range.").

In sum, Appellants have not pointed to any provision in NEPA requiring an agency to authorize all phases of a proposed action evaluated in an EIS at the time it issues an ROD. We thus find that it is not an independent violation of NEPA, warranting reversal of the district court's judgment, for the Navy to enter into a construction contract after it signs an ROD authorizing construction and after having its NEPA analysis upheld by the district court. The district court's judgment that the Navy complied with NEPA is due to be affirmed.

## B. Appellants' ESA Claims

### i. *"Meaningful" Analysis of the Entire Action*

Appellants also contend that the NMFS's biological opinion is arbitrary and capricious in violation of the ESA because it did not "meaningfully" analyze the "entire action" proposed by the Navy—including both the installation and the operation phases of the USWTR. In support, Appellants first point to statements in the Navy's ROD and the NMFS's cover page to its biological opinion that they claim indicate that the biological opinion only considered installation. *See*

24

DON185919 ("[T]he Navy's [S]ection 7 consultation under the ESA is only with regard to the installation of the [R]ange.  Navy will initiate another formal consultation under Section 7 of the ESA to address A[nti] S[ubmarine] W[arfare] training on the USWTR in the 2014/2015 timeframe."); AR001731 (stating that "[e]nclosed is the National Marine Fisheries Service's (NMFS) Biological Opinion on the effects of the U.S. Navy's proposal to install an Undersea Warfare Training Range . . ." and noting that "[t]his Opinion concludes that the U.S. Navy's proposal to install an Undersea Warfare Training Range (USWTR) is not likely to adversely affect endangered or threatened species under NMFS['s] jurisdiction or critical habitat that has been designated for those species . . ."). However, Appellants ignore the very next sentence of the cover page which states, "We have concluded that anti-submarine warfare *training activities* the U.S. Navy plans to conduct on [the] USWTR are likely to adversely affect endangered whales, but [are] not likely to jeopardize the continued existence of those whales." AR001731 (emphasis added). Appellants also overlook that the Navy's ROD explains that the "NMFS provided Navy with a Biological Opinion (BO) on July 28, 2009, in which it analyzed the effects of both installation *and use* of the USWTR" and characterizes the biological opinion as concluding that "activities associated with the [anti-submarine] *training* on [the USWTR] are likely to adversely affect but are not

25

likely to jeopardize the continued existence of endangered and threatened species." DON185885-185886 (emphasis added).

Irrespective of these statements as to whether the biological opinion analyzed only the installation phase or both the installation phase and operation phase of the USWTR, the content of the over 100-page biological opinion itself confirms that it analyzed both installation and operation. The biological opinion defines the proposed action for purposes of analysis to include both USWTR installation and operations. It then discloses the nature of the anti-submarine warfare training to occur on the USWTR, and it specifies the "operating procedures" to be used in anti-submarine warfare activities to protect endangered species. The biological opinion also specifically identifies "stressors . . . potentially associated with the Operations Phase" of the USWTR, such as ship strikes, the effects of sonar, and the risk of entanglement from small parachutes, analyzes the likelihood that listed species will be exposed to such stressors associated with operations, and analyzes the likely response of listed species that are exposed to such stressors.

Despite these details pertaining to operations on the USWTR, Appellants still contend that while the biological opinion purports to consider operations, its analysis with regard to operations was not "meaningful" because it does not reflect the "unique nature" of the USWTR. Appellants say that this failure is apparent

26

from portions of the biological opinion that appear to be cut-and-pasted from the biological opinions of the Navy's other anti-submarine warfare training projects along the eastern seaboard, including the biological opinions from the much-larger Jacksonville Operating Area. The NMFS admits that portions of the biological opinion contain summaries of the "results of the analyses" from existing biological opinions on the Navy's anti-submarine warfare training on the eastern seaboard and in the Jacksonville Operating Area, where the USWTR will be located. The Navy's stated reason for this overlap is that ongoing anti-submarine warfare training operations in the Jacksonville Operating Area are already covered by the required NEPA and ESA documentation and permits, and operations at the USWTR are not expected to significantly change training already occurring in the area.

We agree with the NMFS and the Navy that the summary of impacts of the same level of training from other biological opinions does not undermine the analysis in the biological opinion for the USWTR because the biological opinion also clearly considered the specific types of training proposed for the USWTR. For example, in the biological opinion's actual conclusions, it discusses impacts to listed species from operations on the USWTR itself. The section of the biological opinion entitled "Integration and Synthesis of Effects" contains ultimate conclusions of the analysis as to each listed species. For right whales, it notes that

the Navy has likely overestimated the number that will be exposed to sonar because of the "relatively short duration" of the planned exercises on the USWTR, "the small number of surface and submarine vessels" associated with the training and the "very small probabilities [of right whales] occurring in any particular 500 square mile area." AR001925. For each affected species of sea turtle, the biological opinion notes the "relatively small size of the proposed [USWTR] relative to the density of sea turtles that might occur on the training range" in determining the impact from operations. AR001926. In addition, it is clear from the biological opinion that the NMFS's analysis was also informed by the Navy's final EIS and biological assessment, two documents not challenged by Appellants in this appeal. These documents are part of the administrative record for the biological opinion, and each considered the USWTR-specific environmental impacts compared with the other four locations that the Navy proposed for the USWTR. For example, the biological opinion discloses that "NMFS relied solely on the results of models the U.S. Navy conducted for their NEPA compliance documents for the [USWTR]" when evaluating the exposure of marine mammals and sea turtles to stressors associated with operating the USWTR. AR001753. Those Navy models include modeling of acoustic effects at each of the four alternative locations for the USWTR studied, and Appendix D to the EIS contains detailed model results for each training scenario at each alternative site. The

28

model results were different for each location studied, demonstrating that the Navy considered impacts on the USWTR site selected. The NMFS relied on the Navy's data in the biological opinion, as it discusses the data specifically in the "Integration and Synthesis of Effects" section. *See* AR001923-001928. The NMFS therefore adequately considered impacts of operations on the USWTR as opposed to some broader area.[6]

As further evidence that the biological opinion did not consider the unique characteristics of the USWTR as compared with the larger Jacksonville Operating Area, Appellants point to a statement made in the Navy's recent application for an MMPA take authorization for marine mammals connected with other Navy training on the Atlantic coast, as follows: "[S]onar activities could be concentrated on the [USWTR] after it is constructed. Potential acoustic impacts from major

---

[6] Contrary to Appellants' assertions, it makes no difference to our review that some of the data supporting the NMFS's analysis in the biological opinion appears in the Navy's final EIS and biological assessment rather than in the biological opinion itself. The NMFS was a cooperating agency in preparing the Navy's EIS, and the ESA regulations envision agency coordination on ESA and NEPA compliance. *See* 50 C.F.R. § 402.06 (providing that consultation, conference, and biological assessment procedures under Section 7 of the ESA may be consolidated with interagency cooperation procedures required by other statutes, such as NEPA). Moreover, our judicial review under the APA is based on the "whole record." 5 U.S.C. § 706. There is "no requirement that every detail of the agency's decision be stated expressly in the [biological opinion]" as long as the "rationale is present in the administrative record underlying the document." *In re Operation of Mo. River Sys. Litig.*, 421 F.3d 618, 634 (8th Cir. 2005) (citations omitted). *See also Miller v. Lehman*, 801 F.2d 492, 497 (D.C. Cir. 1986) ("[W]e are required to uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned. In addition, if the necessary articulation of basis for administrative action can be discerned by reference to clearly relevant sources other than a formal statement of reasons, we will make the reference.") (citations and quotation marks omitted).

training exercises, especially behavioral impacts, could be more pronounced given the duration and scale of the events."  *See* Navy Request for Regulations and Letters of Authorization for the Incidental Taking of Marine Mammals Resulting from U.S. Navy Training and Testing Activities in the Atlantic Fleet Training and Testing Study Area, *available at* http://nmfs.noaa.gov/pr/pdfs/permits /aftt_navy_loa_application2012.pdf.  This communication by the Navy to the NMFS was made after the briefing before the district court in this case and over three years after the EIS, biological opinion, and ROD were issued.  The Court will not consider it because it is not part of the administrative record and is thus not grounds for setting aside NMFS's "no jeopardy" opinion, which had to be based on the best information available at the time regarding the likely effects of USWTR operations.  *See* 16 U.S.C. § 1536(a)(2) (purpose of consultation is to insure that proposed action is "not likely" to result in jeopardy and biological opinion must be based on the "best scientific and commercial data available").  *See also Pres. Endangered Areas of Cobb's History, Inc.*, 87 F.3d at 1246 ("The focal point for judicial review of an administrative agency's action should be the administrative record.") (citing *Camp v. Pitts*, 411 U.S. 138, 142, 93 S. Ct. 1241, 1244, 36 L.Ed.2d 106 (1973)); *Sierra Club v. Bosworth*, 510 F.3d 1016, 1026 (9th Cir. 2007) ("Post-decision information may not be advanced as a new rationalization either for sustaining or attacking an agency's decision.") (internal alterations,

30

quotation marks, and citation omitted).  Even if the Court were to consider this evidence, and to the extent that information does become available indicating that the USWTR location has unique characteristics not already considered, or that the Navy's decision to further "concentrate" training on the range results in some changes to impacts on listed species, those impacts will be considered in the already-planned future consultations before there will actually be any operations resulting in impacts.  *See* 50 C.F.R. § 402.16(c) (providing for reinitiation of consultation if "the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion").

Appellants also rely on a series of decisions from the Ninth Circuit Court of Appeals holding that biological opinions must be "coextensive in scope" with the agency action.  *See, e.g., Conner v. Buford*, 848 F.2d 1441, 1457-58 (9th Cir. 1988) (holding that "biological opinions must be coextensive with agency action" and rejecting the argument that a federal agency could meet its ESA obligations by addressing portions of the agency action incrementally as each portion went into effect); *Greenpeace v. Nat'l Marine Fisheries Serv.*, 80 F. Supp. 2d 1137, 1150 (W.D. Wash. 2000) ("A biological opinion which is not coextensive in scope with the identified agency action necessarily fails to consider important aspects of the problem and is, therefore, arbitrary and capricious."); *Nat'l Wildlife Fed'n v. Nat'l*

31

*Marine Fisheries Serv.*, 524 F.3d 917, 930 (9th Cir. 2008) (finding that allowing segmentation under the ESA would mean that "a listed species could be gradually destroyed, so long as each step on the path to destruction is sufficiently modest"). As an initial matter, the rule that biological opinions must be coextensive in scope with the "entire action" or else violate the ESA is nowhere to be found in the language of the ESA and we decline to adopt that rule here. In any event, the cases relied on by Appellants addressed situations where federal agencies compartmentalized the analysis of actions and thereby avoided discussing the entire scope of the action. In contrast here, the NMFS's biological opinion analyzed both installation and operations and is therefore "coextensive in scope" with the Navy's entire proposed action. So even if this Court were to adopt the Ninth Circuit's test, the biological opinion in this case would satisfy it.

In sum, the Court is convinced that the biological opinion and supporting administrative record, including the biological assessment and EIS prepared by the Navy, sufficiently considered, not only installation, but also the operations that are expected to occur on the USWTR, in reaching the ultimate conclusion that no take of listed species is likely from installation and that "activities associated with the Operations Phase of the [USWTR] are likely to adversely affect but are not likely to jeopardize the continued existence of" listed species. *See* AR001929. Section 7(a)(2) of the ESA required nothing more of the NMFS.

32

Indeed, while Appellants assert that the Navy's and the NMFS's decision to structure their EPA consultation the way that they did, *i.e.*, deciding to study operational impacts again in a new biological opinion before operations are authorized, undermines the Navy's initial consultation with the NMFS or the NMFS's biological opinion, Section 7(a)(2) of the ESA does not require that consultation under the act take place in any particular manner.  Section 7(a)(2) simply directs the federal agency to "insure" in consultation with the NMFS or the FWS that its actions are not likely to jeopardize the existence of listed species or their critical habitat.  *See* 16 U.S.C. § 1536(a)(2).  It is for the agencies to determine how best to structure consultation to fulfill Section 7(a)(2)'s mandate. The United States Supreme Court has recognized on numerous occasions that "the formulation of procedures was basically to be left within the discretion of the agencies to which Congress has confided the responsibility for substantive judgments."  *See, e.g., Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc*. 435 U.S. 519, 524, 98 S. Ct. 1197, 1202, 55 L.Ed.2d 460 (1978).  The Court has described this principle as "an outgrowth of the congressional determination that administrative agencies and administrators will be familiar with the industries which they regulate and will be in a better position than federal courts or Congress itself to design procedural rules adapted to the peculiarities of the industry and the tasks of the agency involved."  *FCC v. Schreiber*, 381 U.S. 279, 290, 85 S. Ct.

33

1459, 1467, 14 L.Ed.2d 383 (1965).  Utilizing their administrative discretion, the Navy and the NMFS decided that since expected operations on the USWTR will have essentially the same impact as ongoing submarine warfare training operations that have already been analyzed in previous consultations and biological opinions, and that since expected operations on the USWTR are not likely to jeopardize listed species, they would analyze the known impacts of expected operations now, but in the future consider those impacts again in a new consultation before operational activities commence.  That decision is due deference by this Court because there is no statutory basis for ordering that the consultation be carried out in some other manner.   If anything, it appears that the Navy's future consultation with the NMFS regarding operations on the USWTR will ensure that any adverse impacts to listed species will be considered closer in time to when operations will actually commence.  *See* DON185885-185886 ("Delaying the application for incidental take authorizations will also allow for incorporation of the best available science, as required by the MMPA and ESA, at that time in the analysis of potential environmental effects.").  After all, the ESA's requirement that the federal agency avoid jeopardy remains in force throughout the life of a project, and the project must be abandoned or reasonable and prudent measures to avoid jeopardy must be adopted, if later stages of a project result in jeopardy to listed species.  *See* 50 C.F.R. §§ 402.14(i)(4), 402.16(a).  As long as the initial stage of

34

the project does not foreclose the adoption of these reasonable and prudent measures, *see* 16 U.S.C. § 1536(d), and as long as the conclusions of the biological opinion are not arbitrary, a staged structuring of consultation may comply fully with Section 7's mandate. Here, the Navy has expressed that if jeopardy from operations is determined to be likely during the future consultation; having installed the range will not limit the reasonable and prudent measures available for structuring operations to avoid jeopardy, including abandonment of the range.

The record indicates that the NMFS analyzed the entire action, including both the installation and operation phases of the USWTR, in its biological opinion, and the Navy's and the NMFS's decision to analyze impacts from operations again in a future consultation does not undermine their existing consultation or the resulting biological opinion. Therefore, the Court cannot say that the Navy and the NMFS acted arbitrarily and capriciously in this regard and summary judgment with regard to this issue is due to be affirmed.

### ii. Lack of an Incidental Take Statement for Operations

Appellants also claim that the biological opinion is arbitrary and capricious for an entirely independent reason: it fails to include an incidental take statement for operations on the USWTR. As an initial matter, NMFS's biological opinion concluded that no take of listed species is likely to occur from installation of the USWTR. Thus, no incidental take statement was required regarding the

35

construction phase of the project.  *See Ariz. Cattle Growers Ass'n,* 273 F.3d at 1240.  Appellants do not challenge the biological opinion on this point.  However, the biological opinion also concluded that take of listed species may occur in connection with operations on the USWTR, but that no jeopardy to listed species would occur pursuant to operations.  Pursuant to the ESA, then, the NMFS is required to issue an incidental take statement that relates to operations on the USWTR, lest the Navy incur take liability pursuant to Section 7 of the ESA.  *See* 50 C.F.R. §§ 402.14(g)(7) (providing that during formal consultation, the expert agency must "[f]ormulate a statement concerning incidental take, if such take may occur"), 402.14(i)(1) (requiring that an incidental take statement specifying the amount or extent of take, reasonable and prudent measures to minimize such impact, required terms and conditions, and measures necessary to comply with the MMPA be provided "with the biological opinion").

However, the NMFS provided a valid reason for its failure to include an incidental take statement for operations in the biological opinion.  Because an MMPA take authorization for listed marine mammal species, such as right whales in this case, must precede the NMFS's issuance of an incidental take statement, *see* 16 U.S.C. § 1536(b)(4)(C), and because MMPA take authorizations are only effective for five year periods, *see* 16 U.S.C. § 1371(a)(5)(A), the NMFS and the Navy rationally concluded that any MMPA take authorization pertaining to

36

operations on the USWTR that the NMFS obtained at the time the biological opinion was issued in 2009 would expire long before the USWTR's operational date expected to be sometime between 2018 and 2023. To avoid redundant authorizations and wasting resources, the NMFS and the Navy chose to postpone the process of obtaining the MMPA take authorization and the resulting incidental take statement until the Navy reinitiates formal consultation with the NMFS on operations prior to authorizing training.

In response to the NMFS's reasoning, Appellants do not dispute that an incidental take statement, at least for marine mammals, must be predicated on an MMPA authorization of such taking pursuant to 16 U.S.C. § 1371(a)(5). *See* 16 U.S.C. § 1536(b)(4)(C). Instead, they restate their argument that in order for the biological opinion to be complete it had to "meaningfully" analyze the effects of operations on the USWTR as well as installation. *See* Reply Brief of Appellants p. 25 ("But if Defendants had performed a comprehensive analysis of the entire action, rather than segmenting their decision-making, such permit [e.g., the MMPA authorization] could have—and indeed should have—already issued."). Indeed, the dispute between the parties is not whether an incidental take statement must issue, but when. Appellants say that the Navy could and should have waited to authorize both construction and operations until after it had obtained an MMPA take authorization, just as it did with the construction and operation of a training

37

range off the coast of Southern California. *See* MMPA Take Authorization, 74 Fed. Reg. 3882 (Jan. 21, 2009).

Irrespective of whether the West Coast range referenced by Appellants also complies with the ESA, we find that it was not arbitrary or capricious for the NMFS to postpone the issuance of an incidental take statement for right whales in this situation. As an initial matter, no incidental take statement is required now, as the USWTR is still in the installation phase where no take of any listed species is expected. *See Ariz. Cattle Growers Ass'n*, 273 F.3d at 1240. The biological opinion can be upheld on that ground alone. Moreover, an MMPA take authorization and corresponding incidental take statement, which will pertain solely to operations on the range, will serve no purpose while the USWTR is still in the installation phase and no operations are actually occurring. These permits will certainly not serve their statutory purpose of creating a safe harbor from take liability, and obtaining them now would be a meaningless exercise. In any event, the Navy has repeatedly committed to obtaining the required MMPA take authorization and incidental take statement during a future consultation with the NMFS, prior to operations on the range commencing.

We also reject Appellants' argument that the current lack of an incidental take statement cannot be remedied in the course of a subsequent formal consultation because, they claim, without an incidental take statement, the

biological opinion omits the important "trigger" of the amount of take of listed species necessary to cause the Navy to reinitiate consultation with the NMFS. *See* 50 C.F.R. §§ 402.14(i)(4) ("If during the course of the action the amount or extent of incidental taking . . . is exceeded, the Federal agency must reinitiate consultation immediately."), 402.16(a) (providing for same). *See also Miccosukee Tribe of Indians of Fla.*, 566 F.3d at 1271-72, 1275 ("An incidental take statement may lawfully authorize harm to an endangered species as long as the statement sets a 'trigger' for further consultation at the point where the allowed incidental take is exceeded, a point at which there is a risk of jeopardizing the species.") (citing 50 C.F.R. § 402.14(i)(4)). Appellants' concern is unwarranted because the current biological opinion provides that its lack of an incidental take statement for operations means that the Navy must reinitiate consultation with the NMFS if even a single take of a listed species occurs. *See* Biological Opinion, 001931 ("because this Biological Opinion did not exempt any 'take' of endangered or threatened species, the U.S. Navy would be required to reinitiate formal consultation if one or more individuals of an endangered or threatened species is 'taken'"). Thus the current lack of an incidental take statement means that the "trigger" for reinitiating consultation is set to its strictest setting, not that there is no trigger.

Finally, we must address Appellants' argument that certain listed species of sea turtles are not marine mammals and are thus not covered by the MMPA, so the

NMFS has no statutorily-based argument that the biological opinion did not have to include an incidental take statement for sea turtles during operations. The NMFS responds that it rationally concluded that since the Navy will have to engage in further consultation with the NMFS to obtain the MMPA take authorization for marine mammals, an incidental take statement for all species, including sea turtles as well as right whales, would issue at that time in the new biological opinion pertaining to operations. The biological opinion thus provides, "If and when such [MMPA] regulations or authorizations are issued, the [NMFS] will prepare a new biological opinion to include an incidental take statement *for the endangered and threatened species that have been considered in the biological Opinion*, as appropriate." AR001930 (emphasis added). The Navy's rationale is supported by the record and is due deference by this Court. Thus, we do not find that it was arbitrary or capricious for the NMFS to postpone the issuance of an incidental take statement for sea turtles in this situation.

To be clear, this Court is not condoning the lack of an incidental take statement in a biological opinion, if one is warranted. The incidental take statement serves important purposes of measuring conservation and monitoring take to ensure both that the agency really does ensure against jeopardy and that any take that occurs in minimized. *See* 50 C.F.R. § 402.14(i). But we read the ESA as only requiring the incidental take statement to be included in the biological opinion

40

if take of listed species is likely in the first place.  Here, no take is likely because no take is expected from installation and because the Navy will not operate the range without first engaging in further environmental analysis with the NMFS.  In other words, there is no possibility that operations will occur on the USWTR that may take a listed species that will not be covered by a new biological opinion. That new biological opinion will include any necessary incidental take statements and MMPA take authorizations.  Under the facts of this case, the NMFS's decision to postpone the issuance of the incidental take statement for all listed species until closer in time to when the operations that warrant it actually occur was not inconsistent with the ESA's statutory scheme or otherwise arbitrary or capricious. The judgment of the district court is due to be affirmed on Appellants' ESA claims.

## VI.    CONCLUSION

For the foregoing reasons, we affirm the district court's grant of summary judgment.

**AFFIRMED.**