[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-11172

_____

D.C. Docket No. 0:17-cv-62317-JIC

BBX CAPITAL,
f.k.a. BankAtlantic Bankcorp, Inc.,

Plaintiff - Appellant,

versus

FEDERAL DEPOSIT INSURANCE CORP,
in its corporate capacity,
BOARD OF GOVERNORS OF THE FEDERAL RESERVE BOARD,

Defendants - Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(April 7, 2020)

Before ROSENBAUM, JILL PRYOR, and BRANCH, Circuit Judges.

PER CURIAM:

This case concerns severance payments that Plaintiff-Appellant BBX Capital ("BBX") seeks to make to five former executives of BankAtlantic (the "Bank"), a federally insured savings bank that BBX's predecessor-in-interest, BankAtlantic Bancorp Inc. ("Bancorp"), used to own. Those severance payments were part of a 2011 Stock Purchase Agreement (the "SPA") that sold the Bank to BB&T Corporation ("BBT"). At that time, however, the Bank was operating in a "troubled" condition, and both the Bank and Bancorp were operating under consent orders that prohibited them from making any so-called golden parachute payments absent approval by the Federal Reserve Bank (the "FRB") and concurrence by the Federal Deposit Insurance Corporation (the "FDIC"; together with the FRB, the "agencies"). The SPA also called for BBT to reimburse BBX for any severance payments made to the executives.

After the sale of the Bank was finalized, the FDIC notified BBX that it considered the severance payments to be golden parachute payments and that it would approve payments of only twelve months of salary to each executive, significantly less than what the SPA called for. The FDIC also concluded that BBT was required to seek and receive approval before making the reimbursement payments to BBX. Subsequently, the FRB approved the same payment amounts but took no action with respect to approving any payments over 12 months of salary because the FDIC had already prohibited any additional payments.

2

BBX then filed this action claiming that the agencies' decisions were arbitrary and capricious and violated due process. The district court dismissed BBX's action against the FRB for lack of standing because FRB had not injured BBX, and the court granted summary judgment in favor of the FDIC. BBX now appeals. After careful review of the record and the briefs, we affirm.

## I.

### A.    Legal Framework

In 1990, Congress added Section 1828(k) to Title 12. That section provides that "the [FDIC] may prohibit or limit, by regulation or order, any golden parachute payment or indemnification payment" to institution-affiliated parties ("IAPs"), including "any director, officer, [or] employee" of the insured bank. 12 U.S.C. §§ 1828(k), 1813(u). As relevant here, "golden parachute payment" means the following:

> (A) [A]ny payment (or any agreement to make any payment) in the nature of compensation by any insured depository institution or covered company for the benefit of any institution-affiliated party pursuant to an obligation of such institution or covered company that—
>
> > (i) is contingent on the termination of such party's affiliation with the institution or holding company; and--
> >
> > (ii) is received on or after the date which—
> > . . .
> > > (III) the institution's appropriate Federal banking agency determines that the insured depository institution is in a troubled condition . . .

3

12 U.S.C. § 1828(k)(4)(A).

The FDIC's implementing regulations define "golden parachute" in a largely similar manner. *See* 12 C.F.R. §§ 359.0, 359.1(f). Notably, the regulations define "payment," which is incorporated by the golden parachute payment definition, to include "[a]ny direct or indirect transfer of any funds[.]" *Id.* § 359.1(k)(1).

The regulations also set forth the process by which a covered company can seek and receive approval to make golden parachute payments. A covered company that intends to make a golden parachute payment must file an application with the FDIC and with its primary federal regulator, in this case the FRB. *See* 12 U.S.C. § 1813(q)(3)(F); 12 C.F.R. §§ 303.244, 359.4(a)(1), 359.6. A golden parachute payment is prohibited unless excepted. 12 U.S.C. § 1828(k)(1); 12 C.F.R. § 359.2.

To gain regulatory approval to make a golden parachute payment, the applicant must first "demonstrate" and "certify" that it is not aware of any reason to believe the IAP (i) has "committed any fraudulent act or omission, breach of trust or fiduciary duty, or insider abuse," (ii) was "substantially responsible" for the institution's troubled condition, or (iii) has "violated any applicable Federal or State banking law or regulation." 12 C.F.R. § 359.4(a)(4)(i)-(iii); *see also* 18 U.S.C. § 1828(k)(2). The contents of that certification are not at issue here, but, significantly, only if the applicant demonstrates that the IAP satisfies those requirements will the

4

IAP be *eligible* to receive a golden parachute payment.  12 C.F.R. § 359.4(a)(4)(i)-(iii).

If that threshold certification requirement is satisfied, then the regulations provide for three categories of permissible payments, only two of which are relevant here:    the "regulator's-concurrence exception" and the "change-in-control exception."  *Id*. §§ 359.4(a)(1), (3).[1]  The regulator's-concurrence exception permits a golden parachute payment if "[t]he appropriate federal banking agency, with the written concurrence of the [FDIC], determines that such a payment or agreement is permissible[.]"  *Id*. § 359.4(a)(1).   The change-in-control exception permits a "reasonable severance payment, not to exceed twelve months salary," "in the event of a[n] [unassisted] change in control of the insured depository institution," provided that the institution first "obtain[s] the consent of the appropriate federal banking agency[.]"  *Id*. § 359.4(a)(3).

In determining whether to permit a payment under one of the listed exceptions, § 359.4(b) provides that the FDIC and the FRB "may consider" the following factors:

> (1) Whether, and to what degree, the IAP was in a position of managerial or fiduciary responsibility;
>
> (2) The length of time the IAP was affiliated with the insured depository institution or depository institution holding company, and the degree to

---

[1] No party contends that the third exception, the "white knight" exception, applies here.  12 C.F.R. § 359.4(a)(2).

which the proposed payment represents a reasonable payment for services rendered over the period of employment; and

(3) Any other factors or circumstances which would indicate that the proposed payment would be contrary to the intent of section 18(k) of the Act or this part.

12 C.F.R. § 359.4(b)(1)-(3).

## B.    Factual Background

In 2011, Bancorp sought to sell the Bank, which it owned entirely, to BBT under the SPA.  The SPA provided that, upon closing, Bancorp would be obligated to make severance payments to, as relevant here, five executives (the "Proposed Payments"), and BBT would reimburse BBX for those payments.[2]  Those Proposed Payments were significantly greater than each executive's average salary over the prior years.

In the wake of the 2008 Great Recession, however, both Bancorp and the Bank had been deemed to be, and remained in 2011, in "troubled condition," were covered companies, and were operating under public consent orders that, among other things, prohibited the making of any golden parachute payments unless Bancorp complied with the FDIC's corresponding regulations.  In addition, BBT's acquisition of the Bank and Bancorp's merger with BBX, under the SPA, required regulatory review

---

[2] The Proposed Payments are as follows:  Valerie Toalson, Chief Financial Officer ($995,438); Lloyd DeVaux, Chief Operating Officer ($1,319,114); Jay McClung, Chief Risk Officer ($743,258); Lewis Sarrica, Chief Investment Officer, ($920,451); and Susan McGregor, Chief Talent Officer ($893,713).

and approval.  To expedite that approval process, Bancorp agreed that it would not make the Proposed Payments without either a determination by both the FDIC and the FRB that the payments were not golden parachutes, or FRB and FDIC approval of the payments.  BBT agreed to the same conditions with respect to its reimbursement payments.  The sale of the Bank to BBT closed on July 31, 2012, with the non-objection of the FDIC and the FRB.

The following year, the FDIC notified BBX that the proposed severance payments (and any reimbursements) were golden parachutes that could not be made without FRB approval and FDIC concurrence.  With respect to two of the executives, DeVaux and McClung, the FDIC found that though those executives had previously executed severance agreements in 1999 and 2001, respectively, the Proposed Payments set forth in the SPA replaced payments due under the earlier agreements.[3] Finally, the FDIC determined that the reimbursement payments from BBT to BBX also constituted indirect golden parachute payments and therefore required approval.

In September 2013, BBX submitted its applications to make the Proposed Payments to each of the executives but also reaffirmed its disagreement about the applicability of the golden parachute provisions.

---

[3] The FDIC subsequently also noted that for both DeVaux and McClung, the amount provided for under the SPA "was more than the amount due to him upon resignation or change in control under his employment contract."

The FDIC issued its decisions in January 2018. It first confirmed that the Proposed Payments were subject to the golden parachute regulations. Quoting the preamble to its golden parachute regulations, the FDIC noted that § 1828(k)(4)(A)(ii) "provides that any payment which is contingent on the termination of an IAP's employment and is received on or after an institution or holding company becomes troubled is a prohibited golden parachute. If this payment is prohibited under the prescribed circumstances, it is prohibited forever." So changes to the corporate structure—that is, BBT's purchase of the Bank and BBX's exit from the banking industry—did not change the applicability of the restrictions.

In addition, the FDIC determined that BBX is subject to golden parachute regulations as a "covered company" for the purposes of the Proposed Payments. And even if BBX were not a covered company, the Proposed Payments would still be subject to the golden parachute restrictions because they arose from the executives' employment at BankAtlantic and Bancorp and would be made after the date those entities had been deemed to be troubled. Finally, the FDIC determined that the specific Proposed Payment negotiated for each executive qualified as a golden parachute payment.

Then, turning to whether the Proposed Payments were permissible, the FDIC concluded that it would not approve payments in any amount above one year's salary

8

for each executive.  The FDIC explained that its decision "fully considered Bancorp's and the Bank's supervisory history, BBX's status as successor to Bancorp, the agreements at issue, and the text, structure and intent of Section 1828(k), the certification factors found at 12 C.F.R. § 359.4(a)(4), and the discretionary evaluative criteria found at 12 C.F.R. § 359.4(b)."

Specifically, the FDIC determined that it "would have no objection and would concur, if the FRB were to approve payment . . . in [an] amount . . . representing twelve months salary" under the change-in-control exception.  But though additional payments could be permitted under the regulator's-concurrence exception, the FDIC determined that additional payments under that exception were not justified based on its internal guidance and the § 359.4(b) factors.  In reaching those conclusions, the FDIC considered that the executives had limited  responsibility for the Bank's troubled condition that "arose in the context of a protracted national economic downturn" and that BBT had acquired the Bank in an unassisted transaction without loss to the FDIC.  Nonetheless, the FDIC found that approval of the entire Proposed Payment would be contrary to the intent of the golden parachute restrictions and that independently supported its one year's salary determination.

About two weeks later, the FRB issued its decision.  The FRB approved payment of 12 months of salary under the change-in-control exception.  As to any excess amounts potentially permissible under the regulator's-concurrence exception,

though, the FRB determined that "no further action [wa]s required" and explicitly "t[ook] no action with regard to those payment amounts" because "FDIC concurrence," which had already been withheld, "is required before those payments can be made." Finally, the FRB stated, "It is anticipated that BB&T will reimburse BBX Capital for the golden parachute payments pursuant to Section 5.7(h) of the [SPA]. BB&T must request approval under 12 C.F.R. part 359 prior to making reimbursements for the golden parachute payments."

In response, BBX sued the FDIC and the FRB under the Administrative Procedure Act ("APA") and the Due Process Clause of the Fifth Amendment. BBX's amended complaint asserts that (1) the FDIC's determinations that the Proposed Payments are golden parachute payments and the agencies' refusal to approve the full Proposed Payment amounts were arbitrary and capricious (Counts I and II); (2) the agencies violated BBX's due-process rights by requiring BBT to file a second application before reimbursing BBX (Count IV); and (3) the court should declare that BBX is authorized to make the Proposed Payment (Count V).[4]

---

[4] Count III asserts that the agencies unlawfully or unreasonably delayed in rendering a decision. Because the agencies subsequently did issue their decisions, that count is not at issue here.

The district court subsequently granted summary judgment in favor of the FDIC and dismissed the FRB for lack of jurisdiction, concluding that the FRB was not responsible for any injury BBX sustained.  We now affirm.[5]

## II.

We turn first to BBX's argument that the district court erroneously concluded that BBX lacked standing to sue the FRB.  We review standing determinations *de novo*, *CAMP Legal Def. Fund, Inc. v. City of Atlanta*, 451 F.3d 1257, 1268 (11th Cir. 2006), and find that BBX's arguments lack merit.

"[S]tanding is an essential and unchanging part of the case-or-controversy requirement of Article III[,]" which the party invoking federal jurisdiction has the burden of proving.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). "[T]he irreducible constitutional minimum of standing under Article III consists of three elements: an actual or imminent injury, causation, and redressability." *Hollywood Mobile Estates Ltd. v. Seminole Tribe of Fla.*, 641 F.3d 1259, 1265 (11th Cir. 2011) (internal quotation marks omitted).[6]

The causation element, which we focus on here, requires "a causal connection between the injury and the conduct complained of—the injury has to be fairly

---

[5] We have jurisdiction pursuant to 28 U.S.C. § 1291.

[6] A party suing under the APA must also demonstrate prudential standing, which requires the interest asserted be "within the zone of interests to be protected or regulated by the statute that he says was violated." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012) (internal quotation marks omitted).  BBX's prudential standing is not at issue.

11

traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560 (alterations adopted). That requirement does not disappear simply because the plaintiff has named an administrative agency as a defendant. Instead, as with any party that is dragged into court, a plaintiff must allege how the agency's action or inaction caused the plaintiff's alleged injury. *See Hollywood Mobile Estates Ltd.*, 641 F.3d at 1265-66. Simply describing an agency's regulatory responsibilities is not enough. *Id.* On the other hand, standing is not defeated merely because the complained of injury can be fairly traced to multiple parties. *Loggerhead Turtle v. Cty. Council of Volusia Cty., Fla.*, 148 F.3d 1231, 1247 (11th Cir. 1998).

BBX first argues that it has standing to sue the FRB because the FRB issued its decision after the FDIC issued its own decision. That argument is premised on the text of the regulator's-concurrence exception, which states that a golden parachute payment is permissible if "[t]he appropriate federal banking agency [the FRB], with the written concurrence of the [FDIC], determines that such a payment or agreement is permissible[.]" 12 C.F.R. § 359.4(a)(1). We do not read that section as requiring the agencies to act in any particular order. Such a requirement would have at least one absurd consequence: By issuing its decision before the FRB, the FDIC, an independent agency, would cause the *FRB to violate* the regulation and, if BBX had its way, cause the FRB to injure the golden parachute applicant. We cannot

12

countenance that result. And in any event, the FRB did not injure BBX by acting after the FDIC issued its decision. Because the regulator's-concurrence exception requires permission from both agencies, one denial, in any order, vetoes the Proposed Payment. Here, it was the FDIC's veto that caused BBX's injury.

Next, plaintiff argues that the FRB's substantive decision, as opposed to the timing of that decision, injured it. We disagree.

As an initial matter, the FRB approved 12 months of salary, the maximum available, under the change-in-control exception. That decision did not harm BBX.

As to the regulator's-concurrence exception, the FRB explicitly took no action because the FDIC had already prohibited any payment under that exception. Because golden parachute payment approval under that exception requires two "yeses" from the governing agencies, even if the FRB had approved payments in excess of 12 months' salary, no payment could be made. So again, it was the FDIC's decision to prohibit any payment in excess of 12 months' salary, and not the FRB's non-decision, that harmed BBX.

Facing the fact that the FRB's non-decision did not harm it, BBX asserts that it was harmed by the FRB's decision to "rubberstamp" the FDIC's decision. To begin, that argument is factually incorrect because, as to the regulator's-concurrence exception, the FRB neither approved nor rejected the FDIC's decision. So it didn't rubberstamp anything.

13

Pointing to *Strickland v. Alexander*, 772 F.3d 876, 885-86 (11th Cir. 2014), BBX argues that even the FRB's performance of a ministerial task supports Article III standing. But there, we did not hold that the performance of a ministerial task alone could support standing. Rather, we held that when an injury *traceable to a defendant* exists, the ministerial nature of the action taken—i.e., the causal connection—will *not* somehow void the injury or causation and thereby defeat standing. *See Alexander*, 772 F.3d at 885-86.

BBX's reliance on *Loggerhead Turtle* is similarly misplaced. As the district court explained, "the critical factual difference[] between this case and *Loggerhead Turtle*" is that the *Loggerhead Turtle* defendant had "absolute authority to issue environmental ordinances that would . . . prevent plaintiffs' injuries. That is not so here, where the FRB has no authority whatsoever to control the FDIC—an independent agency."

Finally, BBX argues that it was harmed by the FRB's determination that BBT must seek approval before reimbursing BBX. True, the FRB's decision letter stated, "BB&T must request approval under 12 C.F.R. part 359 prior to making reimbursements for the golden parachute payments." But that wasn't an adverse decision; it was a statement of the law, as interpreted by the FDIC. The FDIC had already determined that the payments qualified as golden parachute payments, and the FRB had no authority to override the interpretation by an independent agency.

14

Moreover, in order to expedite approval of the SPA, BBX and BBT contractually agreed that the Proposed Payments would not be made unless both the FRB and the FDIC determined the payments were not subject to the golden parachute provisions. As the FDIC has already rendered an unfavorable determination on that point, BBX can hardly complain that the FRB somehow injured it by stating that BBT must seek approval to reimburse BBX—that's exactly what BBT and BBX agreed to.[7]

In sum, because BBX has not shown any injury it has sustained is fairly traceable to an FRB action or inaction, BBX does not have standing to sue the FRB.

**III.**

Next, we turn to BBX's argument that the district court erred by granting summary judgment in favor of the FDIC. BBX makes two overarching arguments in support of its primary APA claims. First, BBX asserts that the FDIC decision to classify the Proposed Payments as golden parachute payments was arbitrary and capricious. Second, BBX contends that even if that decision was not arbitrary and capricious, the FDIC's denial of any payments in excess of 12 months' salary for each executive was itself arbitrary and capricious. Finally, BBX argues that the FDIC's requirement that BBT obtain approval before reimbursing BBX was arbitrary and capricious and violated the Due Process Clause.

---

[7] Because our standard of review is *de novo* and we conclude that BBX has not established standing to sue FRB, we need not address BBX's other argument that the district court erred by applying a proximate-cause standard.

15

We review a grant of summary judgment *de novo*. *Preserve Endangered Areas of Cobb's History, Inc. v. U.S. Army Corps of Eng'rs*, 87 F.3d 1242, 1246 (11th Cir. 1996). Summary judgment is proper if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over such a fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

Federal courts review challenges to agency decisions under the standard set forth by the APA. *See* 5 U.S.C. § 706; *see also Fund for Animals, Inc. v. Rice*, 85 F.3d 535, 541 (11th Cir. 1996). The APA provides, in relevant part, that a court shall "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). "The arbitrary and capricious standard is exceedingly deferential." *Miccosukee Tribe of Indians of Fla. v. United States*, 566 F.3d 1257, 1264 (11th Cir. 2009) (internal quotation marks omitted). So long as the agency's conclusions are rational, we will not set them aside. *Id.* That deference is enhanced

16

when the agency is making decisions within its area of special expertise, as opposed

to simple findings of fact. *Id.* Nevertheless, we may find an agency action

> arbitrary and capricious where the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Id.* (quoting *Alabama–Tombigbee Rivers Coal. v. Kempthorne*, 477 F.3d 1250, 1254

(11th Cir. 2007)).

Relatedly, "[w]hen Congress has explicitly left a gap for an agency to fill,

there is an express delegation of authority to the agency to elucidate a specific

provision of the statute by regulation, and any ensuing regulation is binding in the

courts unless procedurally defective, arbitrary or capricious in substance, or

manifestly contrary to the statute." *United States v. Mead Corp.*, 533 U.S. 218, 227

(2001) (internal citation and quotation marks omitted). And "[a]n agency's

interpretation of its own regulations is controlling unless plainly erroneous or

inconsistent with the regulation." *Sierra Club v. Johnson*, 436 F.3d 1269, 1274 (11th

Cir. 2006) (internal quotation marks omitted). But when a regulation merely parrots

the language of the authorizing statute, the question for the courts is the meaning of

the statute. *See Gonzales v. Oregon*, 546 U.S. 243, 257 (2006).

**A.**

BBX first contends that the golden parachute statute does not cover the payments at issue here.  Specifically, BBX argues that the FDIC has (1) erroneously decided to apply the golden parachute provisions in perpetuity to any institution ever classified as "troubled" and (2) erroneously concluded that the SPA fell within the plain language of the statutory regime.  Those arguments fail for essentially the same reason:  the golden parachute provisions focus on qualifying payments, not on qualifying institutions.

*Chevron* requires us to first look at the plain meaning of the statute.[8]  *Chevron U.S.A. Inc. v. NRDC Inc.*, 467 U.S. 837, 842-43 (1984).  If it is unambiguous and does not lead to absurd results, then the analysis ends there.  *Packard v. Comm'r*, 746 F.3d 1219, 1222 (11th Cir. 2014); *Silva-Hernandez v. U.S. Bureau of Citizenship & Immigration Servs.*, 701 F.3d 356, 363 (11th Cir. 2012) ("This Court's one recognized exception to the plain meaning rule is absurdity of results.").  "In determining whether a statute is plain or ambiguous, we consider the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *In re BFW Liquidation, LLC*, 899 F.3d 1178, 1188 (11th Cir. 2018) (internal quotation marks omitted).  A statute is ambiguous "if it is susceptible

---

[8] BBX also argues that we should revisit *Chevron*.  We are, of course, unable to do so. *Bosse v. Oklahoma*, 137 S. Ct. 1, 2 (2016) ("[I]t is th[e] [Supreme] Court's prerogative alone to overrule one of its precedents.").

to more than one reasonable interpretation." *Id.* Only if we determine the statute is ambiguous do we reach the second step of *Chevron*, which requires us to defer to the agency's construction of a statute it administers if that construction is permissible. *Chevron*, 467 U.S. at 842-43.

Section 1828(k) authorizes the FDIC to prohibit or limit any golden parachute *payment* or any *agreement* to make such a payment: "The term 'golden parachute payment' means any payment (*or any agreement to make any payment*) . . . that (i) is contingent on the termination of such party's affiliation with the institution . . . and . . . (ii) is received on or after the date the institution's Federal banking agency determines that the . . . institution is in a troubled condition[.]"  12 U.S.C. § 1828(k)(4)(A) (emphasis added). The SPA is exactly that:  an agreement to make severance payments by an institution to its executives after the institution was determined to be (and remained) in a troubled condition. By its plain language then, the golden parachute statute covers the SPA and the Proposed Payments included therein.

Rather than addressing the plain language of the statute, BBX argues that Congress did not intend for the statute to be applied to well-performing executives of institutions that have recovered from their troubled state. We are unconvinced by that argument for a host of reasons. First, whatever supposed intent BBX gleans from its reading of the statute, we may not ignore the plain meaning of the statutory

19

text unless it leads to absurd results, which it does not.  Second, the Bank was still a "troubled" institution at the time the SPA was executed, so it had not "recovered." Third, despite BBX's assertion to the contrary, the FDIC does not apply the golden parachute provisions to once-troubled institutions in perpetuity.[9]  Rather, it applies the provisions to qualifying payments and agreements to pay in perpetuity.  So if the Bank was in fact no longer "troubled," then it could have executed new severance agreements that would not have been subject to the golden parachute restrictions.

The FDIC's focus on payments and agreements to make payments that qualify as golden parachutes is reasonable and makes sense.  A contrary reading would allow otherwise prohibited golden parachute payments to be made through simple corporate restructuring or by delaying the payments until after the institution is either no longer covered (as is the case here) or until after the institution is no longer "troubled."  *See, e.g., Council for Urological Ints. v. Burwell*, 790 F.3d 212, 225 (D.C. Cir. 2015) (upholding as reasonable statutory interpretation that prevented evasion); *NRA v. Brady*, 914 F.2d 475, 481 (4th Cir. 1990) (same).

BBX's final two argument can be dispatched with alacrity.  First, BBX argues that the proposed payments do not qualify as golden parachute payments because

---

[9] BBX complains that the FDIC's final decisions relied on the FDIC's preamble to its golden parachute regulations that states, "If th[e golden parachute] payment is prohibited under the prescribed circumstances, it is prohibited forever."  But that language is perfectly consistent with § 1828(k).

BBX was under no *obligation* to pay severance unless and until the sale of the Bank to BBT closed, at which point BBX would completely exit banking, making it no longer subject to FDIC regulations. *Cf.* 12 U.S.C. § 1828(k)(4)(A) (defining golden parachute payment as including any payment or agreement to pay "pursuant to an obligation" that is contingent on the IAP's termination). But an obligation does not vanish merely because a triggering precondition has not yet occurred. The SPA was an agreement that obligated BBX to make certain qualifying payments once certain conditions were met. That puts it within the golden parachute framework's purview.

Second, BBX argues that the Proposed Payments to McClung and DeVaux are not golden parachute payments because those two executives had executed severance contracts in 1999 and 2001, when the Bank was not in a troubled condition. That argument fails because, pursuant to the SPA, Bancorp expressly assumed the Bank's obligation to pay those executives the amounts contemplated by the SPA. The earlier agreements are thus irrelevant because the Proposed Payments to McClung and DeVaux are being made under the SPA, not those earlier agreements.

Moreover, though the prior severance agreements did not qualify as golden parachutes, if the two executives were terminated in 2011 (without the SPA superseding the earlier agreements), the golden parachute provisions would nevertheless apply to *payments* due under those agreements. *See* 12 U.S.C. §

21

1828(k)(4)(A) (defining golden parachute payment to include any payment "received on or after the date on which . . . the institution" is determined to be "troubled"). Thus, BBX would have us conclude that though payment could not be made under the prior severance agreements, those same agreements somehow exempt the SPA's Proposed Payments to McClung and DeVaux. We cannot agree with that illogical reasoning.

Because the Proposed Payments fall directly under the plain language of the statute, we cannot conclude that the FDIC's decision to apply those provisions was arbitrary or capricious.

**B.**

BBX next complains that the FDIC's decision to deny any payment to the five executives in excess of 12 months' salary under the regulator's-concurrence exception was arbitrary and capricious. BBX argues that the FDIC's decision was arbitrary and capricious because the FDIC failed to consider evidence that the five executives committed no fraudulent acts or omissions or insider abuses, were not otherwise responsible for the troubled condition of the Bank, and to the contrary, steered the bank through the Great Recession to the benefit of depositors.

BBX's argument gets the regulatory framework wrong. Ordinarily, payments that qualify as golden parachute payments are prohibited unless excepted and deemed permissible. 12 C.F.R. § 359.2. Under § 359.4(a)(4), BBX has the initial

22

burden of showing the executives' good (or not bad) behavior, which includes certifying that BBX is not aware of a reasonable basis to believe the executives committed any fraudulent act, violated any banking law, or were responsible for the institution's troubled condition.   Only after BBX has satisfactorily made that showing does the FDIC move on to the question of whether other considerations, including the discretionary factors set forth in § 359.4(b), weigh in favor of allowing golden parachute payments to be made.   That is, the executives' good behavior opens the door to a proposed payment.   And once the door had been opened, the statute and the regulations do not require the FDIC to address the executives' purported good behavior when determining whether to permit the Proposed Payments.   That aside, BBX's argument fails for the additional reason that the FDIC did explicitly consider the executives' limited responsibility for the Bank's troubled condition.

We also conclude that the FDIC's analysis of the discretionary factors set forth in § 359.4(b) supports its decision.[10]   First, the FDIC found that each of the executives had a "high degree of 'managerial or fiduciary responsibility.'"   As each executive was a chief officer of some type, that conclusion can hardly be deemed

_____

[10] The FDIC's decision also relied on its internal guidance that advised that the regulator's-concurrence exception should not be viewed as permitting golden parachute payments in excess of one year's salary.  Though BBX mounts several arguments against that guidance, we need not address them because we find that the FDIC's analysis of the § 359.4(b) discretionary factors independently supports its decision.  We do, however, reject, as factually inaccurate, BBX's argument that the agency based its decision solely on its internal guidance.

23

arbitrary or capricious.  Second, the FDIC considered the length of each executive's tenure at the company compared to that executive's compensation during that time, finding each of the executives "well compensated during his [or her] tenure."  BBX does not challenge that conclusion, and we have no basis to doubt it.

As to the third factor, which calls for a more wide-ranging inquiry, the FDIC "fully considered that the Bank's troubled condition arose in the context of a protracted national economic downturn, which hit Florida markets particularly hard."  It also accounted for the fact that the Bank was acquired in an unassisted transaction without loss to the FDIC or taxpayer funds.  "Nonetheless, the FDIC f[ound] that approval" of the full Proposed Payment would be "contrary to the intent" of § 1828(k) because "executives at the helm of" troubled institutions "should not be awarded windfall payments."  Congress's primary focus, in enacting the golden parachute provision, was to prevent executives from "vot[ing] themselves generous bonuses at the expense of the institution or company . . . ."  136 Cong. Rec. E3684-02, E3687, 1990 WL 206971 (Oct. 27, 1990); H.R. Rep. 101-681(I), 1990 U.S.C.C.A.N. 6472, 6588 (Sept. 5, 1990) (same).[11]    That's the position the executives were in here.

---

[11] For the same reason, we are unpersuaded by BBX's argument that *because* the executives had substantial managerial and fiduciary responsibilities, they should be awarded the full Proposed Payments.

Nor is there any indication that the FDIC relied on factors that Congress did not intend for it to consider.  And we find no merit in BBX's remaining contentions.

In short, the FDIC's decision was not arbitrary and capricious because the FDIC did exactly what it was supposed to do.  It considered the discretionary factors, it considered additional factors that weighed in BBX's favor, and it neither refused to consider relevant factors nor relied on irrelevant factors.  The explanations the FDIC offered for denying additional payments were reasonable and did not run counter to the evidence.  We therefore affirm.

## C.

Finally, BBX argues that the FDIC's requirement that BBT seek approval before reimbursing BBX was arbitrary and capricious because it did not offer any reasoned basis for the requirement.  But in its April 2013 correspondence, the FDIC did explain why it considered BBT's reimbursement payments to be "indirect" golden parachute payments.  The FDIC's final determination letters incorporated that 2013 correspondence by reference.  The decision was therefore not arbitrary or capricious for failure to provide a reasoned analysis and, in fact, we find the FDIC's analysis reasonable.

Nor did the decision violate due process.  Other than claiming that it has a property interest in the reimbursements—which it no doubt does—BBX does not explain how its due-process rights were violated by the FDIC's decision requiring

25

BBT to gain approval before reimbursing BBX.  Due process requires only that parties whose liberty or property interests are affected by governmental adjudications be given "notice and an opportunity to be heard."  *See United States v. James Daniel Good Real Property*, 510 U.S. 43, 48 (1993).  Though BBT's reimbursement application and BBX's proposed payment application may have some overlap, BBX cites no authority suggesting that the Due Process Clause prohibits any duplication of labor.

## IV.

For the reasons we have described, we affirm the district court's dismissal of the claims against the FRB for lack of standing and affirm the grant of summary judgment in favor of the FDIC.  We also **CANCEL ORAL ARGUMENT** in this case.

**AFFIRMED.**